Thank you, Your Honors. May it please the Court, Counsel. My name is James Roberts, and I have the pleasure of representing Appellant Christopher Lankford in this matter. I've reserved three minutes for rebuttal. It is well settled in the Eighth Circuit that deadly force is only authorized when the officer has probable cause to believe, at the time he uses that deadly force, the suspect poses a significant threat of serious bodily injury or death to the officer or others. And when the Court analyzes whether or not the officer has that probable cause, the Court is to look at only the facts known to the officer at the time they use deadly force. The district court in this case erred by relying on facts unknown to Officer Duvall in this matter at the time he used deadly force and deciding that they should grant the motion for summary judgment and finding that there was not a constitutional violation. But what's your version in terms of what he knew and what he didn't know? Judge Smith, what Officer Duvall did not know was anything regarding what transpired during the pursuit. Officer Duvall testified that he set up the roadblock within 15 to 20 seconds after hearing of the call on dispatch. He testified that he only knew that there was a motorcycle fleeing at a high rate of speed around 100 miles an hour in his direction. Well, what can you conclude from someone operating a motor vehicle in excess of 100 miles an hour on a two-lane highway? Judge Smith, what we know is there needs to be something more. There needs to be some sort of malicious act, and that comes from the Hutchins case. That is an Eighth Circuit case out of 2020. In that case, it's Cole Estate of Richards v. Hutchins. An officer shot a man that had a gun. This court decided that there were not enough facts to give the officer probable cause to decide that he could use deadly force simply because the man had a gun. This court said there needed to be something more. There needed to be either a furtive movement of the gun or him raising it towards an officer or another. And that wasn't present in that case. That's what we have here. That theme of needing something more is also spread throughout all of the case laws cited by the district court as well as Appelli in this case. Scott v. Harris out of the Supreme Court, Plumhoff v. Ricard, Mullenix v. Luna, and Morrow v. Meechum, a Fifth Circuit case that Appelli has cited too. In each of those cases, it was not simply an analysis of whether or not there was a high-speed pursuit, but instead an analysis of during this high-speed pursuit, what happened that caused there to be a danger or a threat to others? Did he know about the weaving in between traffic? Was that something he would have been aware of? Judge Smith, are you speaking of the Scott v. Harris case or the Langford case? Your case, the Langford case. Yes, Your Honor. No, he did not. What Officer Duvall has testified to, it's in the record, he says that he had only known that there was a high-speed chase on a motorcycle headed in his direction. And then he knew about that for 15 to 20 seconds since he got the radio dispatched to go towards the pursuit. Counsel, in this case, isn't the something more the danger to the public of someone entering Plummerville at 100 miles an hour? Judge Gross, I believe the something more, as you can see in Scott v. Harris, in Plumhoff, in Mullenix, and even in Morrow, requires there to be some dangerous act, this malicious act. The threat to some hypothetical people down in Plummerville was not an immediate threat, as cited in many of the cases. In Scott v. Harris, the officer who used deadly force, at the time they used deadly force, Officer Scott knew the fleeing suspect had collided with his car, had run other cars off the road, had run multiple red lights, had spent considerable time driving in the oncoming traffic turn lane. In Plumhoff, that officer knew that the fleeing suspect had collided with his car, had collided with another police cruiser, and had, at the time deadly force was used, was flush against another police cruiser, spinning his tires as if to accelerate, endangering the lives of officers who were standing next to the car. In Mullenix v. Luna, in that case, it wasn't just a matter of was this person fleeing at a high rate of speed, but they knew that the officer, Officer Mullenix, knew at the time that they used force by shooting the fleeing suspect, that he had told dispatch twice that he had a gun and he was going to shoot officers who attempted to stop him as he raced towards an officer setting up a spike strip under the overpass. Again, that's information that the officer knew. In each one of these cases in the Supreme Court, the officer at the time they used deadly force knew of more than just fleeing at a high rate of speed. Even in the Moro v. Meacham case, which is cited by appellees from the Fifth Circuit, it's a case that involved a fleeing motorcyclist. That's really where the similarities stop, because in that case, the officer who used deadly force knew that at the moment they used deadly force and rolling over into the lane of traffic causing a collision with the motorcyclist, he was going 150 miles an hour in the oncoming traffic lane, head on towards oncoming traffic. It was not simply an analysis of was this person speeding away from the police, but when this person was speeding away from the police, what were they doing to endanger lives? In Scott v. Harris, they put a rule that they say we're going to give a simple rule in this case, but it's not simply a rule about high-speed chases. It's dangerous high-speed chases. If it was simply high-speed chases, then in each one of these cases in front of the Supreme Court, in front of Morrill v. Meacham, in front of the Fifth Circuit, and in this case, you could stop the analysis simply at was the person fleeing at a high rate of speed. Now, was Officer Duvall instructed to put his vehicle in the lane of traffic? No, Your Honor. Or requested to do so. Judge Smith, in the record at 359, Corporal Adam Bryant, who was with the Morrillton Police Department, testified he did not ask for Officer Duvall to pull his patrol vehicle in front of a fleeing motorcyclist. He said that he didn't do this because he knows that you can't do that. It's against the law and it's dangerous. Because each one of these officers, the Morrillton officers, Officer Dube, who was pursuing the motorcyclist, Officer Adam Bryant, and Assistant Chief Trent Anderson, all testified this was not a deadly force situation. That's at 384 for Officer Dube of the record, 361 of the record for Corporal Adam Bryant, and then for Assistant Chief Trent Anderson, 408 and 410 through 412, where he gives a lengthy explanation of when you can use deadly force on a motorcyclist. For instance, if they're driving down the road shooting at someone. But they didn't have that here. All three of the other officers involved in this case testified this was not a deadly force situation, including the officer whose dash camera video we have, which shows the entire pursuit take place. Counsel, what was Officer Duvall told by the dispatcher? Officer Duvall was told that there was, that Morrillton police was chasing a fleeing motorcycle going, I believe they said, 100 or 105 miles per hour towards Plummerville. And that's where Officer Duvall was stationed. But didn't he also ask if he wanted, if he was to block the road? Judge Gross, yes, he did ask whether he was to block the road. That is his testimony in the record. However, there is a disputed fact on whether or not he was told that he should block the road. Well, is it part of the recording? The dispatcher, Carrie Cannon, testified in the record at 404 to 406. She was asked if she remembered telling him 10-4 when he asked that question. She said she did not remember that. However, we have more. This is in the situation. Is it in the recording? It cannot be heard in the recording, Your Honor, no. And she listened to it. She testifies in the record at 406. She listened to that recording three times during her deposition at full volume, she says. And she does not hear anything like that. Those were her words. So it is not in the recording, which means that there is at least a disputed fact whether or not he was told this. He says that he was, but there is evidence showing that that did not occur. Therefore, he did not have any information other than the fact that there was a fleeing motorcyclist going at a high rate of speed in his direction. Counsel, I agree he wasn't shooting at anyone and he wasn't going head-on the wrong direction down the road, but why wasn't he posing a threat of serious physical harm to others? Well, Judge Gross, the question is whether or not Officer Duvall knew that he was posing a serious threat of physical harm or death to others. The question, and that's if we look at cases such as Malone v. Hinman, which is a 2017 case out of this circuit, which Judge Smith authored the opinion of. In that case, there was a good Samaritan had taken a gun from a shooter and was running to get help from the police. However, this court said that it wasn't what happened that mattered. It's what the officer perceived. In that case, this court said that the officer perceived hearing gunshots, seeing someone running through a crowd with a gun towards an officer, and not stopping or putting the gun down when told to. Therefore, when that officer used deadly force, it was the facts that he perceived, and not the facts as they were, that this was actually someone trying to diffuse the situation. So it is not what actually occurred in this case. It's not what Mr. Langford did or did not do during the pursuit. It's what Officer Duvall perceived and was aware of. And that's what the standard is. The standard is what did the officer, at the time he used force, deadly force, that is, perceive, did he have probable cause to believe the person posed a significant threat of serious bodily injury or death? And if you go back to 1993, the case of Colvie Bone, an opinion written by Judge Woolman, in that case, there was an 18-wheeler was driving from Kansas to Missouri. The 18-wheeler was clearly wreaking havoc and out of control, running cars off the road, colliding with cars, putting people's lives in actual danger. In that case, the trooper, Trooper Rice, ended up shooting the driver of that 18-wheeler. And Judge Woolman wrote in his opinion, In analyzing the reasonableness of Trooper Rice's decision to use deadly force, we examine the information that Rice possessed at the time of the decision. Went on to say, In light of the facts and circumstances confronting him, that is, Rice, in light of all the information that was available to him, and there's an explanation of what information is available to Trooper Rice in that opinion regarding what he could know to give him probable cause. And in that explanation, it discusses all the information that Trooper Rice perceived, as well as the fact that he was sent a radio report regarding what happened in Kansas prior to the 18-wheeler getting to Missouri. So again, this is not necessarily what actually occurred, but what the officer perceived. And just as recently as last month, in the Eighth Circuit, Williams v. City of Burlington, Iowa, this exact rule was part of the equation. In that case, an officer was chasing a fleeing person on foot who had a gun. The person undisputedly, after the fact everyone now knows, dropped that gun prior to being shot. However, this Court said it's not what happened that matters. It's what the officer perceived. The Court then cited back to Wheelett v. Brooks, a 2017 case, with substantially similar facts to that of Williams. And again, in that case, the person fleeing had dropped the gun prior to being shot. But what was material was not what happened. It's what the officers perceived from their viewpoint when they were running. Counsel, does it make any difference to our analysis that Lankford could have slowed down or stopped but purposely plowed right through the roadblock or attempted to? Judge Gross, I would respectfully disagree that the facts show that he purposely plowed through the roadblock. I believe the facts show that he tried to go around Officer Duvall. But he didn't stop. I think he testified that he was fleeing and didn't intend to stop. Officer Gross, that is absolutely correct. He was fleeing. However, simply fleeing is not enough to use deadly force against someone unless there is that something more, unless there is that malicious act like is found in Scott v. Harris and Plumhoff v. Ricard and Mullenix v. Luna and even in the case cited by Appelli. Let's suppose that the entire road was blocked with a structure, a roadblock, and he decided I'm going to drive into it at 100 miles an hour. Is there a difference there? Well, in this case, when you look, Judge Gross, in this case, when you look at the facts, if a motorcyclist is driving 100 miles an hour into the side of something, I think that that may be them using deadly force on themselves. There is a difference between using some sort of collision to stop a vehicle versus a motorcycle, which is exactly what, excuse me, Assistant Chief Trent Anderson states in the record at 410 to 412 that you need to take into account that a motorcycle cannot, you cannot use the same force on a motorcycle that you can a car. Even Officer Duvall testified that he knew he couldn't use spike strips in this situation because of the severe harm it would cause to the person on a motorcycle. I do see that I have, yes, sir. Was Lankford, did Lankford have a constitutional right to an unimpeded highway? I don't believe that, Judge Wollman, no. Mr. Lankford did not have a constitutional right to an unimpeded highway. However, he did have a constitutional right under the Fourth Amendment not to have excessive deadly force used against him, unless the officer had probable cause to believe at the time he used the deadly force that Mr. Lankford posed a significant threat of serious bodily injury. In other words, if the officer had had the privilege of watching the video, as we have had, he would have been entitled to do whatever he wanted to do? Judge Wollman, I don't know if I would say he would be entitled to do whatever he wanted to do respectfully. I think that there would still be an analysis of whether or not that justified the use of deadly force. However, what we know in this case is that Officer Duvall did not have the privilege of watching what was going on. He simply had 15 to 20 second knowledge that there was a flaying motorcycle coming in his direction, and that is simply not enough to give probable cause to use deadly force. Unless, of course, he was concerned about the possible additional hazards that your client was posing to the public? Judge Wollman, and that is what— He knew that Lankford was driving, what, 110 miles an hour? I believe 105 miles an hour, yes, something around that. I'll give you that. I'll give you that. Yes, sir. It reminded me of the chase scene out of the movie Bullet, and I'm sure you've watched it many—1968 with Steve McQueen? Unfortunately, Judge Wollman, I have not seen that case. Well, I recommend that you watch it at your earliest opportunity. I'll have to do that. You're in your rebuttal. You can continue if you like or reserve. I'll save the remaining time for rebuttal. Thank you very much. Thank you, Mr. Roberts. Ms. Moynihan? Good morning, Your Honors. May it please the Court, I'm Sarah Moynihan on behalf of the Appleese, Albert Duvall, and the City of Plummerville, Arkansas. And I'm requesting this Court affirm the District Court's grant of summary judgment in their favor because, first, even if we take the facts as Mr. Lankford has alleged them and assume that Officer Duvall did pull his car over in front of Mr. Lankford in a manner likely to cause serious injury or death, the United States Supreme Court has made clear in Scott v. Harris and Plumhoff v. Rickard that a police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death. Secondly, at the very least, there is no case factually on point which clearly establishes that the alleged conduct by Officer Duvall violated clearly established law and, in fact, it is our position that Scott and Plumhoff clearly established the constitutionality of Officer Duvall's conduct and, therefore, Mr. Lankford cannot overcome qualified immunity. Well, Counsel, what did Officer Duvall know that would have informed him that this was a situation of such danger to the public or to others in the vicinity, including officers, that deadly force was justified? Well, what Officer Duvall knew is actually very similar to what Officer Scott knew in Scott v. Harris. He knew that Mr. Lankford and the Moralton Police Department were engaged in a high-speed chase that was exceeding speeds of 100 miles per hour and that he was moving at this speed towards the city limits of Plummerville, straight into downtown Plummerville, which is densely populated, and that the Moralton Police Department was requesting his assistance. And it is actually undisputed that it was communicated to Officer Duvall that the Moralton Police Department was requesting that he block the road. Now, how did he know that and what's in the record to tell us that he knew that? He knew that because of what was communicated to him by dispatch when dispatch called. And it's also on the recording when he asked, do they want me to block the road? There is, you can hear a response on the recording. I believe that it says 10-4. Is that a disputed fact? Well, it's not disputed. When Carrie Cannon listened to the recording, she said she did not hear that in the inaudible noise or inaudible response that was heard on the recording. But she also said that it was possible that she said 10-4. And she also said it was possible that the other dispatcher on duty responded to that question with 10-4. So that's not disputed. Well, that is disputed. If somebody says it's possible, it doesn't mean it happened. It's not an affirmative declaration that they either said or didn't say. One side says that's what he heard. The other side says the dispatcher only could have said it. So it seems there's some weakness there. Officer Duvall did say that she did say 10-4. And her response to that was, well, maybe I did. She's not saying she didn't say it. That's not disputed. So that's what we know that Officer Duvall knew. And also submitted a 28-J letter discussing the case U.S. v. Stratton, which basically says that when you're considering reasonableness and you have a team of officers working in an operation together, the collective knowledge theory applies. And the knowledge of all of the officers are imputed to all of the officers. So it was enough for Officer Duvall to know that this chase was headed towards Plummerville at speeds exceeding 100 miles per hour, that Moralton was requesting his assistance, and that Moralton had requested that the road be blocked. That's enough to bring it within Scott v. Harris. That's enough to be reasonable under Scott v. Harris. But we really should look at all of the objective facts and everything that was happening that Moralton was aware of that caused them to request the type of assistance that they requested from Officer Duvall. So really, we should look at all of the objective facts involved in the high-speed chase. And the Court should also consider the U.S. Supreme Court White v. Pauley, which was decided in 2016, which says that an officer that is late arriving to a scene is allowed to assume the lawfulness of the actions of the other officers on scene leading up to his arrival. So you could apply that here and say if Moralton is requesting his assistance with this high-speed chase and requesting that he block the road, he should be allowed to assume that it's a lawful request in this type of rapidly evolving situation. Well, is the key to this case whether or not Duvall moved the vehicle back and forth? That's not the key, the only key to the case. Well, that was a deadly force, wasn't it? Had he parked the car there, and if there were no question that it was just parked crosswise, that was a risk then that Langford would have undertaken. I mean, Langford probably had no constitutional right to an unimpeded roadway, but to have one impeded at the last second, that's the key to it, isn't it? Or one of the keys, maybe it's not. Yes, the video… Is Duvall, with all due respect to him, lying through his teeth when he said that he didn't move the car? Well, I think the video is consistent with what Officer Duvall says. Well, I guess my 87-year-old eyes don't see it quite as clear as you do. Thank goodness we have youthful colleagues on the bench. Well, even if we assume that he did pull his vehicle forward, like Mr. Langford alleges, it was still objectively reasonable under these circumstances, and that's consistent with both funding presidential decisions from the United States Supreme Court, Scott v. Harris, and Plumhoff v. Rickard. And in Scott v. Harris, the Supreme Court relied on the Fourth Amendment's reasonableness standard, as provided by Graham, to determine whether an officer used excessive force in terminating a high-speed chase. And the facts in Scott were similar to the facts in this case, where the fleeing driver led officers on a chase that reached speeds in excess of 85 miles per hour for approximately six minutes. And in deciding whether Officer Scott acted reasonably, the court weighed the risk of bodily harm posed by the officer's actions against the threat the officer was trying to eliminate and found that it was appropriate to take into account not only the number of lives at risk, but their relative culpability. So basically, what the court and Scott did is apply reasonableness analysis, which weighed the potential threat to the fleeing motorist in taking action to end the pursuit, to the risk that was being created to all innocent bystanders who were being subjected to this high-speed chase. And ultimately, the court held that an officer who threatens serious injury or death to a fleeing motorist when terminating a high-speed chase does not violate the Fourth Amendment when the chase threatens the lives of innocent bystanders. Counsel, once the legal test has been met for use of deadly force, as you just recited it, does it matter what type of deadly force is used? And the reason I'm asking this is if we were to affirm, does that mean that in the future officers could shoot a fleeing motorcyclist who posed a threat of serious harm to others? Let's suppose that instead of pulling out in front of him, they shot him. Does that make a difference? Well, I believe under the precedent from the United States Supreme Court, it does not make a difference because, of course, in Plumhoff v. Rickard, the chase was ended by the officers involved in that case by shooting the driver. So no, under the precedent set by the United States Supreme Court, I do not believe that it would make a difference. Would you speak to the 28J letter referencing Williams v. City of Birmingham, Burlington, Iowa, a recent case from last month? Well, again, I think that goes back to my argument surrounding U.S. v. Sutton and White v. Pauley. I think when you're assessing the reasonableness of an officer's actions, you look at the objective facts, not the subjective knowledge of the officer involved. You look at the objective facts and then determine whether or not the force would be reasonable. But having our presidents fairly consistently said you have to look at things from what a reasonable officer in the position of the officer in question had at the time, what could they perceive? Well, U.S. v. Sutton does not say that. It says that you can apply the collective knowledge theory when you're determining reasonableness. And when officers are working as a team, you are allowed to consider all the facts that were known to all of the officers. When you're determining the reasonableness of one officer's actions. And also, like I said, you should also take into account White v. Pauley, which says that an officer arriving late to a scene is allowed to assume the lawfulness of the other officers on the scene up until that point. And here, Officer Duval was allowed to assume that if they requested his assistance and requested he block the road, that it was a lawful request they were making for him to do so, based on the situation that they were facing in actually participating. Well, I shouldn't put words. Is that an ends justified demeans argument, given the facts that he was driving at the high speed? To what extent he knew about any high speed thing? Does that justify what he did? Yes, even if you just look at the facts that Officer Duval was aware of. If you just consider what he knew, he was justified. He knew there was a high speed chase moving toward the city at speeds exceeding 100 miles per hour. He knew that the agency engaged in the chase was requesting his assistance and requesting him to block the road. Their specific request was that it be shut off at the interstate. Even if this court determines that Assistant Chief Duval's actions were unreasonable, he is still entitled to qualified immunity because Mr. Langford cannot demonstrate that Chief Duval violated clearly established law. The Supreme Court has held that clearly established law must be particularized to the facts of the case and that officers in excessive force cases are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. The burden is on Mr. Langford to provide sufficient evidence or identify a case that squarely governs the specific facts of this issue to defeat both prongs of the qualified immunity defense. Mr. Langford has not identified any such case on point which would say that Officer Duval's conduct was unreasonable. The reason for that is because none exists. In fact, as I stated at the beginning of my argument, the U.S. Supreme Court precedent established in Scott and Plumhoff clearly establishes that Officer Duval's alleged conduct was constitutional. Do you agree with the statement of the appellant about the time that Officer Duval had notice of the chase until the actual collision took place? I can't speak to the exact time that he had. Well, the appellant described it as a matter of seconds as opposed to several minutes of the full chase or most of the chase. I agree it definitely wasn't several minutes. He was called. He was given the information about the shockingly high speeds that were being engaged. The video shows, I guess, the back end of Duval's car as he motors to the location, but we don't really know exactly how much time elapses. I didn't count the seconds or the minutes that there was, but I was asking if what you heard as the description of that time was accurate. It could be. I can't cite to the record to dispute that right now. Suppose one of the officers had been driving a Maserati and could have caught up with this fellow. Would he have been justified in running from Langford off the road? Yes, under Scott v. Harris, that would have most definitely been justified. All right. Thank you, Ms. Monahan. Thank you. Mr. Roberts, your rebuttal. I must say, your opposing counsel didn't want to concede anything, did she? Well, that's what being an advocate is all about. Yes, Your Honor. I will start off by saying the question you just asked about the time period between when he heard the call from dispatch to when he set up the roadblock is in the record at page 368. Question, how long did it take you to get from where you got the call from dispatch over to the location where you set up the roadblock? Answer, maybe 15, 20 seconds. As far as U.S. v. Stratton, the case cited in the 28J letter yesterday, that case was cited regarding an officer who had probable cause to arrest someone asking another officer to arrest that person for them. This had nothing to do with excessive use of force, especially excessive use of deadly force. So this was, well, if not split second, this really wasn't a long time for the officer to contemplate what action could or couldn't be taken. Are you talking about U.S. v. Stratton or this case? This case. This case, no. It was 15 to 20 seconds. He said that he asked for, if he was supposed to set up a roadblock, and 5 to 8 seconds from learning of the chase. He did not have any sort of knowledge of what was going on. He simply went there and set up a roadblock and then moved in front of Mr. Lankford's car as he was driving down the road. I see that my time is up. One of the, we judges have to view things dispassionately, and we're supposed to, and not be influenced by the video or anything like that. But I couldn't help saying throughout this thing how lucky Mr. Lankford is that he's still alive. I mean, and thankfully that he was not killed in it. Right? Judge Wallman, yes. I mean, it is very thankful that he wasn't killed. However, we do have to remember that Officer Duvall knew nothing about what was going on, and we must take it from his perspective. That's why we have to stay on the legal and factual issues that are presented to us, not theorize about what, well, anyway. Yes, Your Honor. Thank you. Thank you, Mr. Roberts. Thank you also, Ms. Monaghan. The court appreciates both counsel's participation and argument before the court this morning. We will take the case under advisement and render a decision in due course. Thank you.